

IN THE
TENTH COURT OF APPEALS

No. 10-09-00146-CV

BMTP HOLDINGS, L.P.,

Appellant

v.

CITY OF LORENA,

Appellee

From the 170th District Court
McLennan County, Texas
Trial Court No. 2008-1516-4

## MEMORANDUM OPINION

BMTP Holdings, L.P. appeals the granting of the City of Lorena's traditional motions for summary judgment, the denial of BMTP's traditional motion for summary judgment, and the award of attorney's fees to the City of Lorena. BMTP sued the City of Lorena seeking a declaratory judgment that a moratorium and its progeny imposed by the City relating to permits for sewer connections did not apply to its developments, and that the City could not refuse to grant permits based on such a moratorium and an inverse condemnation cause of action alleging a regulatory taking. The trial court granted two separate traditional motions for summary judgment in favor of the City

and awarded the City its attorney's fees.

BMTP complains that the trial court erred by granting the City's motion for summary judgment and by denying their competing motion on the declaratory judgment action. BMTP further complains that the trial court erred by granting the City's motion for summary judgment on its inverse condemnation claim. BMTP complains that the trial court abused its discretion in the award of attorney's fees to the City. Because we find that the moratorium did not apply to BMTP, we reverse the judgment of the trial court in its entirety, render judgment in favor of BMTP on its declaratory judgment claim, and remand the inverse condemnation claim and the award of attorney's fees to the trial court for further proceedings.

*Statement of Facts*

BMTP was a developer of subdivisions in and around the City of Lorena, Texas. BMTP typically acquired and platted land, constructed infrastructure on that land, and then sold individual subdivided lots to builders or individuals who then built residences on those lots. BMTP would generally complete this in phases, which could each last several years. In 2003, the infrastructure of Phase IV of the South Meadows Estates was completed.

In early 2003, BMTP submitted a preliminary plat for Phase V to the city manager of Lorena, which included the technical details about the infrastructure that BMTP intended to construct. After the city planner and engineers had input, the preliminary plat was reviewed by the Planning and Zoning Commission and then the Lorena City Council voted to approve the preliminary plat. After the approval of the preliminary

plat, BMTP began construction of the infrastructure, which included the necessary facilities to service each lot with water, sewer, and other utilities as well as streets, curbs, and gutters. The sewer system was constructed by installing a line that connected to the City's existing line and then extended a sewer tap to each lot within the subdivision to be later connected to a residence when it was constructed.

The final plat for Phase V was submitted to the City Council for approval, and was approved by the Council's vote on January 16, 2006. Approval of the plat signified that the City had accepted the plat, that the plat complied with any relevant city ordinances, and that the subdivision was ready for residential construction. Prior to the plat's final approval, the sewer taps were required to be connected to the City's sewer system and tested. Before beginning construction on a residence, an application for a sewer connection was required in order to secure a residential building permit from the City.

Although the vote approving the final plat regarding Phase V by the City Council took place on January 16, 2006, the final plat was not delivered to a representative of BMTP until June 5, 2006. The plat was recorded with the McLennan County Clerk by BMTP the same day. When the City Manager delivered the final plat to BMTP's representative, he informed the representative that a moratorium on the issuance of sewer taps had been adopted earlier that day, June 5, 2006. The infrastructure had been fully completed prior to that date. Additionally, by that time BMTP had sold fifteen of the twenty-one lots in Phase V, and all of the lots in Phase IV but one.

The City was aware that it was having substantial capacity problems in its sewer system as early as 2003; however, the City contended that it was not until May of 2006 that they realized the depth of the problem, which led to the initial moratorium. According to the City Manager, it was the responsibility of the City's engineers to review the plat prior to approval and to determine, in part, that the City's infrastructure, including its sewer capacity, was sufficient. It was the opinion of the engineers that the sewer capacity of the City was sufficient to support the subdivision until the end of May, 2006 when the engineers informed the City that the City was operating above its capacity, and that the moratorium was needed to attempt to get the problem under control until a new sewer plant could be constructed.

The final approval of the plat included a statement by the City Engineer that the plat conformed to the City's subdivision ordinance and recommended approval of the final plat. A second engineer certified that "proper engineering consideration" had been given to the plat that had been signed on June 5, 2006, which was the same day that the first moratorium was voted on by the City Council. The plat did not become effective until it was recorded with the County Clerk of McLennan County, which was on June 5, 2006.

The City's moratorium was adopted by an ordinance on its second reading on June 12, 2006 to prevent the connection of any new residential or commercial buildings to the City's sewer system for a period of 120 days. During the 120 days, the City agreed to exempt from the moratorium the fifteen lots in Phase V that had either been sold or were under contract to be sold by BMTP as of June 5, 2006. The original

moratorium was extended and reworded at various times until November 17, 2008, when it was repealed and replaced by a new moratorium that was in large part substantively the same as the prior moratoriums.

On April 24, 2008, BMTP filed a declaratory judgment action against the City of Lorena seeking a declaration that the City's moratorium in effect at that time did not apply to Phase V; that the City could not enforce the moratorium as to the lots in Phase V because they were previously approved for development; and that the City could not deny building permits for the remaining lots in Phase V due to the moratorium.[1]

BMTP filed a motion for summary judgment and the City filed a plea to the jurisdiction, both of which were denied by the trial court. The City then filed a traditional motion for summary judgment. BMTP responded to the City's motion, filed a motion to reconsider the denial of its motion for summary judgment, and amended its petition to include an inverse condemnation cause of action. The trial court granted the City's motion for summary judgment and denied BMTP's motion to reconsider the trial court's prior denial of its motion for summary judgment. The City filed another motion for summary judgment based on the inverse condemnation claim, which the trial court also granted. The trial court also awarded the City its attorney's fees.

*Standard of Review*

Both parties' motions for summary judgment sought judgments that would declare the parties' rights pursuant to the declaratory judgment actions. We review declaratory judgments under the same standards as other judgments. *See* TEX. CIV.

---

[1] The petition seeking the declaratory judgment was later amended by BMTP to include all of South Meadows Estates, which included Phase IV.

PRAC. & REM. CODE ANN. § 37.010 (Vernon 2008).  We look to the procedure used to resolve the issue before the trial court to determine the standard of review on appeal. *City of Galveston v. Tex. Gen. Land Office*, 196 S.W.3d 218, 221 (Tex. App.—Houston [1st Dist.] 2006, pet. denied).  When a trial court resolves a declaratory judgment action on competing motions for summary judgment, we review the propriety of the declaratory judgment using the same standards that we follow in reviewing a summary judgment. *Id.*

We review a trial court's decision to grant or to deny a motion for summary judgment de novo.  *See Tex. Mun. Power Agency v. Pub. Util. Comm'n of Tex.*, 253 S.W.3d 184, 192, 199 (Tex. 2007) (citing rule for review of grant of summary judgment and reviewing denied cross-motion for summary judgment under same standard). Although a denial of summary judgment is not normally reviewable, we may review such a denial when both parties move for summary judgment and the trial court grants one motion and denies the other.  *Id.* at 192.  In our review of such cross-motions, we review the summary judgment evidence presented by each party, determine all questions presented, and render the judgment that the trial court should have rendered. *Tex. Mun. Power Agency*, 253 S.W.3d at 192 (*citing Comm'rs Court v. Agan*, 940 S.W.2d 77, 81 (Tex. 1997)).

Under the traditional summary judgment standard, the movant has the burden to show that no genuine issues of material fact exist and that it is entitled to judgment as a matter of law.  TEX. R. CIV. P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co., Inc.*, 690 S.W.2d 546, 548 (Tex. 1985).  If the order granting the summary judgment does not specify the

grounds upon which judgment was rendered, we must affirm the summary judgment if any of the grounds in the summary judgment motion is meritorious. *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000).

*Local Government Code Chapter 212*

BMTP complains that the trial court erred by granting the City's motion for summary judgment and denying its motion for summary judgment because chapter 212 of the Local Government Code prohibits the imposition of a moratorium on its property that had already been approved for development prior to the imposition of the original moratorium.

Under section 212.135 of the Local Government Code, a municipality has the power to institute a moratorium on property development if it demonstrates a "need to prevent a shortage of essential public facilities." TEX. LOC. GOV'T CODE ANN. § 212.135(a) (Vernon 2008). Sewer facilities are included in public facilities. TEX. LOC. GOV'T CODE ANN. § 212.131(1) (Vernon 2008). Property development is defined as "the construction, reconstruction, or other alteration or improvement of residential or commercial buildings or the subdivision or the replatting of a subdivision of residential or commercial property." TEX. LOC. GOV'T CODE ANN. § 212.131(3) (Vernon 2008).

In order to impose a moratorium on property development to prevent a shortage of essential public facilities, certain written findings must be included by the municipality, one of which is a summary of "evidence demonstrating that the moratorium is reasonably limited to property that has not been approved for development because of the insufficiency of existing essential public facilities." TEX.

LOC. GOV'T CODE ANN. § 212.135(b)(2)(B) (Vernon 2008).

BMTP contends that the approval of their plats constituted "property development" pursuant to section 212.131, and that the moratorium therefore did not, and could not, apply to sewer connections on any of the vacant lots in their approved subdivisions pursuant to the restriction in section 212.131(b)(2)(B) that excludes property that has been approved for development. The City contends that BMTP's scope of approved property development is too broad and that once BMTP completed all of the property development that it was permitted to complete, which was the subdivision and infrastructure only, additional approval was required separate and apart from that to develop the property further, including connections to the sewer system. According to the City, once the subdivision was complete according to the approved plat, then BMTP's property development that was approved was completed and the City could institute a moratorium to prevent additional development of that property.

Prior to the amendment of the statute in 2005, "property development" was defined in section 212.131 of the Local Government Code as "the construction of residential buildings." *See* Acts 2001, 77th Leg., ch. 441, effective September 1, 2001; *amended by* Acts 2005, 79th Leg., ch. 1321 (H.B. 3461), § 1, effective September 1, 2005. The statute was amended in 2005 to add other types of residential development as well as commercial development into the definition of "property development." The City contends that the statute should be read to contain two separate types of property development; the first being the "construction, reconstruction, or other alteration or

improvement of residential or commercial buildings," and the second, "the subdivision or replatting of a subdivision of residential or commercial property." The City further contends that each of the two types of development is separate and distinct for purposes of determining whether property has been "approved for development." *See* TEX. LOC. GOV'T CODE ANN. § 212.135(b)(2)(B) (Vernon 2008).

Neither party has cited to, nor have we found any authority regarding the scope of chapter 212. We find that the definition of "property development" includes the full range of development contemplated by section 212.131(3) and that it does not describe each of the component parts separately and distinctly from the others.

This construction of section 212.131(3) is similar to the application of the term "project" in Chapter 245 of the Local Government Code, which regulates the issuance of permit applications. *See* TEX. LOC. GOV'T CODE ANN. Ch. 245 (Vernon 2005). The term "project" in Chapter 245 has been held to encompass the entire development process from the preliminary plat to the construction of a structure within the subdivision, which does not change unless the scope of the "project" changes, regardless of changes in ownership. *See Hartsell v. Town of Talty*, 130 S.W.3d 325, 328-29 (Tex. App.—Dallas 2004, pet. denied). Chapter 245 contemplates that more than one permit is required to complete a project, but the project includes the entire process, not the discrete components. The definition of "property development" is similarly broad and includes the entire process from platting to finishing construction of infrastructure and buildings.

We hold that the trial court erred by granting the City's motion for summary

judgment based on Subchapter E of Chapter 212 of the Local Government Code. Further, we find that the trial court erred by denying BMTP's motion for summary judgment to make the declarations as prayed for by BMTP. BMTP was entitled to the following declarations:

(1) Under Chapter 212 of the Local Government Code, any moratorium currently in effect on the issuance of sewer taps within the City of Lorena and its extraterritorial jurisdiction does not apply to any of the lots contained in South Meadows Estates, because South Meadows Estates was approved for development before the adoption of these moratoriums;

(2) The City shall not enforce the current moratorium or any extension thereof to the lots contained in South Meadows Estates because those lots have already been approved for development;

(3) The City shall not deny building permits for the remaining lots in South Meadows Estates based upon any existing moratorium.

By this holding, we express no opinion as to whether the City has the ability to deny a permit for reasons other than the moratorium or BMTP's damages, if any, that might be related thereto. We sustain issue one. We sustain issue two solely on the basis of subchapter 212. Because we have determined that Phase V was not subject to the moratorium pursuant to chapter 212, we do not reach the issues of whether or not the moratoriums were enacted in conformance with the requirements of chapter 212 or whether chapter 245 applies.

*Inverse Condemnation*

BMTP complains that the trial court erred by granting the City's motion for summary judgment based on BMTP's inverse condemnation claim. BMTP alleged in its petition that the moratorium constituted a taking pursuant to article I, section 17 of the Texas Constitution. TEX. CONST. art. I, § 17. The City's motion for summary judgment

sought a finding that as a matter of law the moratorium could not constitute a compensable taking.

A taking may be either physical or regulatory. *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 933 (Tex. 1998). A compensable regulatory taking occurs if: (1) the governmental regulations deprive a property owner of all economically viable use of the property or totally destroys the property's value; or (2) the governmental restrictions unreasonably interfered with BMTP's rights to use its property. *See id*. We are to conduct an essentially "ad hoc, factual inquir[y]" using the following guiding factors: (1) the economic impact of the regulation on BMTP; (2) the extent to which the regulation has interfered with BMTP's reasonable investment-backed expectations; and (3) the character of the City's action. *Sheffield Dev. Co. v. City of Elgin Heights*, 140 S.W.3d 660, 672 (Tex. 2004). In addition to these factors, which are generally referred to as the *Penn Central* factors, we should consider all relevant attendant circumstances as well. *Penn Central Transport Co. v. New York City*, 438 U.S. 104, 124, 98 S. Ct. 2646, 57 L. Ed. 2d 631 (1978); *Hallco Tex., Inc v. McMullen County*, 221 S.W.3d 50, 56 (Tex. 2006).

We note that, based on the precedent of the Texas Supreme Court in *Sheffield*, the burden required in the factual allegations presented by BMTP is a high one. *Id*. Sheffield complained that a temporary moratorium constituted a compensable taking but the Court disagreed. *Sheffield* also related to a purchaser of property who purchased the property relying on certain zoning standards then in effect, who had extensive contacts with City officials regarding his plans for the development, and who was similarly, as the Court put it, "blindsided" by the City's moratorium. *See Sheffield*

*Dev. Co.*, 140 S.W.3d at 678. However, while the Court did not approve of the City's methods in *Sheffield*, the Court nevertheless found that there was not a constitutionally compensable taking, either for the change in zoning or for the temporary moratorium.

In *Sheffield*, however, there was not a challenge to the ability of the City to impose the moratorium. *Sheffield Dev. Co.*, 140 S.W.3d at 679. In this case, however, the City's motion for summary judgment on the inverse condemnation action was premised upon the application of the moratorium to BMTP. Therefore, we believe that the judgment entered on the inverse condemnation cause of action must also be reversed and remanded because of our finding that the moratorium did not apply to BMTP's lots. We sustain issue three.

### Attorney's Fees

BMTP complains that the trial court abused its discretion by awarding attorney's fees to the City and denying its request for attorney's fees pursuant to the Uniform Declaratory Judgment Act. TEX. CIV. PRAC. & REM. CODE ANN. § 37.009 (Vernon 2008). Section 37.009 allows for the recovery of attorney's fees that are reasonable and necessary as well as equitable and just. *Id*. Because we have determined that the trial court erred by granting the City's motion for summary judgment and by denying BMTP's motion for summary judgment, we reverse the award of attorney's fees to the City and remand that issue to the trial court for a determination of whether attorney's fees should be awarded and to which party, if any. *See State Farm Lloyds v. Borum*, 53 S.W.3d 877, 894-95 (Tex. App.—Dallas 2001, pet. denied) (reversing and remanding "because the record does not reflect the trial court's reasons for its award of fees to [the

prevailing party], there is no evidence to indicate whether the trial court's award of fees would also be equitable and just in light of our opinion in this case.").  We sustain issue four.

*Conclusion*

We find that the trial court erred by granting the City's motions for summary judgment and by denying BMTP's motion for summary judgment based on the declaratory judgment action.  We reverse and render judgment in favor of BMTP on its declaratory judgment action.  We reverse and remand the inverse condemnation claim to the trial court for further proceedings.  We find that the award of attorney's fees should be reversed and remanded to the trial court for further proceedings in accordance with this opinion.


TOM GRAY
Chief Justice

Before Chief Justice Gray,
     Justice Davis, and
     Judge Sowder[2]
Reversed and rendered in part; reversed and remanded in part
Opinion delivered and filed December 22, 2010
[CV06]

---

[2] The Honorable William C. Sowder, Judge of the 99th District Court of Lubbock County, sitting by assignment of the Chief Justice of the Supreme Court of Texas pursuant to section 74.003(h) of the Government Code.  *See* TEX. GOV'T CODE ANN. § 74.003(h) (Vernon 2005).